1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10   STEVEN EDWARD CRITTENDEN,

11          Petitioner,                    No. CIV S-95-1957 KJM GGH P
                                           No. CIV S-97-0602 KJM GGH P
12       vs.
                                           **DEATH PENALTY CASE**
13   ARTHUR CALDERON,

14          Respondent.                    FINDINGS AND RECOMMENDATION
   _____/
15

16       *Introduction and Summary*

17          The denial of the operative petition in this death penalty case was affirmed in all

18   respects by the Ninth Circuit in its opinion Crittenden v. Ayers, 624 F.3d 943 (9th Cir. 2010),

19   except for the Batson claim involving the third part of the Batson paradigm.[1]  In respect to the

20   remand on that issue, the Ninth Circuit directed that the district court employ the "motivated in

21   substantial part" analysis in lieu of the "mixed motives" analysis employed previously by the

22   district court.

23          After briefing and hearing, the undersigned finds and recommends that the bias

24   shown by the prosecutor when striking one African-American juror, although significant, was not

25   _____

26       [1]Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712 (1986).

                                  1

1  substantial in terms of the prosecutor's motivation.

2      *Procedural History*

3          The entire history of the case is not relevant, and only that pertinent history

4  relevant to the <u>Batson</u> issue will be set forth.  The issue centers about the peremptory challenge

5  by the prosecutor of the sole African-American juror in the capital case venire. In initial Findings

6  and Recommendations, the undersigned recommended that no prima facie case was set forth by

7  petitioner.  The district judge assigned at the time, the Honorable Frank C. Damrell, Jr., disagreed

8  and upon finding that petitioner had set forth a prima facie case, remanded the remainder of the

9  <u>Batson</u> analysis to the undersigned. [2]

10         This further analysis of the last two steps of the <u>Batson</u> analysis was complicated

11 by the fact that the prosecutor had essentially no memory concerning his use of the peremptory

12 challenge.  Nevertheless, the undersigned found that the prosecutor's notes at the time, utilizing a

13 code and cryptic word description, and the context of the voir dire and challenge as set forth in

14 the transcript, enabled the undersigned to find the articulation of non-discriminatory reasons for

15 exercise of the challenge.  Findings and Recommendations, dated February 27, 2003, Docket #

16 163 (hereafter Findings and Recommendations or F & Rs) at 16-21.  This finding was later

17 upheld by the district judge, Order dated February 23, 2005, Docket #180 (hereafter "the Order")

18 at 14-18,  and the Ninth Circuit, <u>Crittenden</u> at 957-958.

19         The undersigned held an evidentiary hearing to determine whether the articulated

20 reasons were pretextual. The substantive facts found at that evidentiary hearing are set forth at

21 length below.  Suffice it to say here that the undersigned found that the prosecutor's

22 reconstructed reasoning was pretextual in part,  i.e., played a significant role, but upon

23 application of the "mixed motives" test (as that test had been defined in case law of other

24 circuits), the undersigned found that a reasonable prosecutor would have exercised the

25 ─────────────

26     [2]The Ninth Circuit later upheld the district judge's finding of a *prima facie* case.
    <u>Crittenden</u> at 957.

1  peremptory challenge even in the absence of discriminatory animus due to Juror Casey's

2  reluctance/ambiguity with respect to her ability to vote for a death penalty verdict if such were

3  warranted by the evidence.  Findings and Recommendations at 21-40.  Put another way, that

4  "prosecutor Flanagan had a good reason to exercise his challenge which outweighed the bad."  Id

5  at 40.  The district judge, although not agreeing with all of the undersigned's analysis,  adopted

6  this finding with an explained decision.  Order at 18-23.

7              While this case was on appeal, the Ninth Circuit determined (in another case in

8  which the undersigned had been involved), that this circuit would not apply the "mixed motives"

9  analysis to Batson challenges.  Cook v. LaMarque, 593 F.3d 810 (9th Cir. 2010).  The Crittenden

10  court applied Cook:

11              Acting prior to our decision in *Cook*, the district court appears to
                have conducted its step three analysis by asking whether race
12              played a "significant" part in the decision to issue the peremptory
                strike, and if so whether the defendant could prove under a mixed
13              motives analysis that the strike would have issued even if race had
                played no role. *Cook* framed the first inquiry in different terms and
14              eliminated the second. As *Cook* explains, the proper analysis at
                *Batson's* step three is whether the peremptory strike was
15              "motivated in substantial part" by race. *Id*. If it was so motivated,
                the petition is to be granted regardless of whether the strike would
16              have issued if race had played no role. *Id*. ("[W]e reject the ...
                mixed-motives analysis, and limit our inquiry to whether the
17              prosecutor was 'motivated in substantial part by discriminatory
                intent.'").

18

19  Crittenden, at 958.

20              However, the Crittenden court did not make the ultimate analysis itself; rather it

21  remanded the case for the district court to make the analysis:

22              As the district court was operating under the erroneous impression
                that the *Batson* inquiry required an additional step–i.e., mixed
23              motives analysis–we remand to give the court an opportunity to
                apply the proper standard, as articulated in *Cook*. We do not
24              foreclose the possibility that the district court could conclude on
                remand that its previous finding that "race played a significant part
25              in the prosecutor's decision to remove Casey" was sufficient under
                *Cook* to establish a *Batson* violation. [FN6 omitted.]   Nonetheless,
26              the district court did not have the benefit of *Cook* when it last

                                        3

1  addressed the question, and its evaluation of the significance of the
2  race factor in the decision to strike Mrs. Casey could have been
   informed by its understanding that there would be another analytic
3  step focusing on the several race-neutral justifications offered. We
   therefore leave it to the district court to make a step three
4  determination in the first instance, unconstrained by its prior
   findings under the pre- *Cook* standard.

5  Crittenden, at 958-959.

6      *Substantive Facts*

7          Three points bear emphasis before recounting the underlying facts.  First, the

8  evidentiary facts underlying the Batson dispute are essentially not at issue as "they are what they

9  are," i.e., based on incontrovertible transcript and other record evidence. Moreover, the parties

10  did not attempt to add new facts into the analytical mix on remand.[3]  Rather, it is the application

11  of those established facts, or the inferences to be drawn from them, which are contested.

12  Therefore, the undersigned will repeat at length those evidentiary facts he initially found.  To the

13  extent that the district judge previously explicated additional/different/superseding evidentiary

14  facts in his discussion, those facts will be included in the discussion.  Further, to the extent that

15  the parties have referred the undersigned to additional, undisputed evidentiary facts, those will be

16  included in this discussion as well.

17          While the complete re-explication of all these facts may seem tedious to counsel

18  who have been involved in this case for years, and who are well aware of the underlying Findings

19  and Recommendations/Orders, the fact is that the district judge newly assigned to this case will

20  not have such familiarity.  Rather than have this judge (the Honorable Kimberly J. Mueller) hunt

21  and sift through the now very voluminous file, the undersigned will place as complete a record as

22  feasible before Judge Mueller.

23          Secondly, the undersigned will not modify the underlying subsidiary factual

24  determinations with respect to the prosecutor's state of mind.  Such would be beyond the

25

26      [3]The parties expressly eschewed any further evidentiary hearing.

4

1   mandate of the Ninth Circuit which simply calls for an application of the already found facts to a

2   new analytical standard, i.e., whether a previously found significant, discriminatory reason for

3   exercising a peremptory challenge was a substantial motivation, or put another way—how

4   significant was significant.  "District courts must implement both the letter and spirit of the

5   mandate, taking into account the appellate court's opinion and the circumstances it embraces."

6   Vizcaino v. USDC (W.D. Wa.), 173 F.3d 713, 719 (9th Cir. 1999) (internal quotation marks

7   omitted).  While the finding under the Ninth Circuit's articulated third step  Batson standard

8   would be considered a new ultimate factual finding, and the Ninth Circuit gave the district court

9   *carte blanche* to reconsider its ultimate finding, the subsidiary facts will not change.

10          Moreover, neither side requests the opportunity to present new facts; it would be

11   odd then in the absence of such, and years later than the initial deeply thought out determinations,

12   to arrive at completely different subsidiary factual determinations. Thus, the undersigned at this

13   point will neither find the absence of a discriminatory motivation on the part of the prosecutor,

14   nor will he find that discrimination was the only reason the prosecutor exercised his peremptory

15   challenge. The undersigned will only determine how substantial was the prosecutor's existing

16   discriminatory motivation.

17          Finally, the undersigned presided at the evidentiary hearing, made credibility

18   findings and issued ultimate findings of facts.  These ultimate findings were adopted *in their*

19   *entirety* by the district judge (Judge Damrell).  The district judge did, however, utilize a different-

20   in-part subsidiary factual basis, disagreeing with the undersigned in part on the underlying,

21   subsidiary factual basis.  The undersigned has been careful to include Judge Damrell's findings,

22   and the undersigned has relied on them where they are different from those of the undersigned.

23   The undersigned has been tasked with making the first decision to employ the Ninth Circuit's

24   Batson third step analytical standard, i.e., the application of those facts to the directed standard.

25   The undersigned has made herein an ultimate factual finding concerning whether the prosecutor's

26   peremptory challenge of Mrs. Casey, the juror in question, was substantially motivated by racial

1   bias.  That ultimate finding is the undersigned's independent finding.

2          The undersigned turns to the subsidiary facts.

3      *The Casey Voir Dire*

4          Prospective juror, Manzanita Casey, the only African-American prospective juror

5   in the entire venire, was initially challenged for cause by the prosecution, and when that

6   challenge was denied, was later peremptorily challenged by the prosecution.  This juror, as did all

7   the other jurors, had furnished questionnaire responses about personal histories and opinions.  At

8   the time of petitioner's trial, prospective juror Casey was married and the mother of two children.

9   Respondent's Exhibit 44 (Evidentiary Hearing) (Casey juror questionnaire).  The questionnaire

10   demonstrated that this juror was concerned about drugs and street crime.  For questions related to

11   potential racial bias, Mrs. Casey demonstrated concern for the lingering existence of bias in the

12   country, but did not believe that her locale (Placer County) had such a problem.  Mrs. Casey's

13   views were not extremist in any manner.  As found previously by the undersigned and the district

14   judge, absent consideration of a willingness to impose the death penalty, Mrs. Casey was

15   seemingly an ideal prosecution juror.

16          Mrs. Casey did express hesitancy about her willingness to apply the death penalty,

17   although at no time did she unequivocally state that she could not vote in favor of such a penalty

18   if warranted under the facts.   She wrote in the juror questionnaire in response to a question about

19   her general feelings about the death penalty: "I don't like to see anyone put to death."  She did

20   not answer other questions concerning whether she thought the death penalty was used too often

21   randomly, or too seldom.  Exhibit  44.  As petitioner points out, Mrs. Casey did say that she

22   could put aside her personal feelings and follow the law.

23          Mrs. Casey was extensively voir dired by the court, defense counsel, and the

24   prosecutor on her death penalty views.  Without being redundant, the pertinent parts of that voir

25   dire are set forth here, as it is important to let juror Casey's responses speak for themselves, at

26   least initially:

1  <u>RT 6106: 23 to 6108: 28</u> Voir Dire by the Court

2      Against that backdrop, I need to ask you some questions about your
       concerns and your opinions regarding the death penalty.
3

4      If the People in the prosecutor [sic] proves beyond a reasonable
       doubt that Mr. Crittenden is guilty of murder in the first degree,
       would you refuse to vote for that verdict because of a conscientious
5      opinion concerning the death penalty knowing that if you did vote
       for a murder in the first degree, you may obligate the jury to get
6      into the question of penalty in a later trial?

7      In other words, would you, even though the prosecutor had shown
       that the murder was a first degree murder, would you nevertheless
8      not vote for it for the reasons of fearing having to reach the issue of
       the death penalty?
9

       A: Well, I am against death -- being put to death.  And I am against
10     people killing people.

11     Q: Okay.

12     A: That is hard to answer.

13     Q: All I am asking you is whether your feelings concerning the
       death penalty would influence your vote to the extent –
14

       A: No —
15

       Q:  – that you would not vote for a first degree murder conviction.
16

       A: No.
17

       Q: Let me also ask you if you have such a conscientious opinion
18     concerning the death penalty that should the jury be requested to
       vote on the issue of the special circumstances, and should the
19     prosecution prove that the special circumstances were true, would
       you refuse to vote for the truth of the special circumstances
20     because you know that if you voted for them, then it would
       obligate the jury to then consider the question of penalty?
21

       A: No.
22

       Q: Now, let me go one step further and let's say you are on the
23     jury, and you have voted for a first degree murder conviction.  The
       jury has found first degree murder.  The jury has also found the
24     existence of the special circumstances.

25  ////

26  ////

7

1
2
3

     Now we are in a different trial.  And, the evidence that will be put before the jury will deal with primarily the defendant, himself. Background, education, schooling, things relating to the defendant generally is what the law provides may be introduced at that trial.

4
5

     Do you have such an opinion concerning the death penalty that regardless of the evidence that would be produced at the penalty trial, that you would automatically and in every case vote against the imposition of the death penalty?

6

A: No.

7
8

Q: Okay.  You can conceive of situations in which you might vote for the death penalty?

9

A: Yes.

10
11
12

Q: Let me ask you the reverse of that.  And I think I know what the answer is.  And that is regardless of the evidence that would be presented at a penalty trial, would you automatically and in every case vote for a death verdict and never vote for life imprisonment without the possibility of parole?

13

A: Would I vote for the death?

14
15

Q: Would you vote for the death automatically and never vote for life imprisonment without possibility of parole?

A: No.

16

17

RT 6111: 10 to 6112: 16 (voir dire by defense counsel)

18
19

Q: As I understand your answers to the Judge's questions just a few moments ago, that as a general principle, you don't agree with execution as a penalty.  Is that correct?

20

A: I don't believe in death penalty.

21

Q: Okay.

22
23

A: And I don't believe in nobody killing anybody either.  So I guess – I don't know what you would say – in between or whatever.

24

     But–

25

Q: Well –

26

A: It is hard.

Q: You have indicated that you can conceive of a situation where a death penalty might be appropriate?

A: Yeah.

Q: Just as in terms of generalities, a crime so bad and a defendant so bad that it appears appropriate that under the standards that you would be instructed to apply, that the death penalty would be appropriate penalty?

A: Yes.

Q: So you are not telling us that in any situation you couldn't or wouldn't vote for a death penalty?

A: No.

Q: What you are telling us is in terms of your opinion, although you have general reservations about it, about the death penalty, it would have to be a severe case before you would?

A: It would be have to be awful bad, yes.

Q: Okay.
   And if it was –

A: And, if I believed it.  You know.

Q: I am sorry.

A: And if I believed it.

Q: Okay.  Believed it being that the situation was awfully bad?

A: Was that bad, uh-huh.

RT 6116: 16 - 6118: 27 (voir dire by the prosecutor)

Q: Do you honestly believe, considering what your feelings are toward the death penalty, that you could vote for a verdict which would mean that this gentlemen here, Mr. Crittenden, would be executed in the gas chamber?

A: Could I vote –

Q: Yes.

A:  – for it?
   I can't sit here and really say for sure if I could.

9

1          But, if it is proven to me, truly proven to me, and I feel deep
2   down inside that   he did it, I could.  I think I could.

    Q: You think you could?
3
    A: Yes.  I have to say I think I could.  This is all new to me.  So I
4   am very upset with it.

5   Q: Well, this is a – for all of us who have thought in any depth
    about the death penalty, very few of us ever get into the position
6   that you are in where you have to–

7   A: It is hard.

8   Q:  – think out loud and tell us what your feelings are.
         Do you think that your feelings about the death penalty – in
9   other words, that you don't believe in it – would make it difficult
    for you to make a decision regarding the death penalty?
10
    A: Yes, I think it would.
11
    Q: And, do you think it might substantially impair your ability to
12  fairly evaluate all of the evidence regarding the death penalty?

13  A: I can't say yes.  I can't say no.  I really don't – don't know.

14  Q: Even – let's say for a moment that a jury has decided, and you
    are on the jury, that Mr. Crittenden has committed these crimes and
15  that special circumstances are involved.  So it is up to the jury then
    to hear evidence about Mr. Crittenden upon which – and including
16  the information about the crimes you have already heard – you are
    going to make a decision about life or death. Okay?
17
    A: Uh-huh.
18
    Q: Do you think that you are in such a position because of your
19  strong feelings about the death penalty that even before you heard
    evidence in that second part of the trial that you would be leaning
20  toward life instead of death?

21  A: No.  I don't think so.

22  Q: You think –

23  A: I could – after I have set there, has set through it all, and had the
    feeling that he did do it, then I think I could –
24
    Q: You understand that neither side in this case wants to have as a
25  juror someone who has their mind made up before?

26  A: I haven't.

Q: Before they heard the facts.

A: I haven't.  Because I haven't heard the facts.

Q: So, is it really the bottom line of your statement to us that despite your statement that you don't believe in the death penalty, that you could still vote for the death penalty if you heard facts and circumstances which warranted it?

A: True.  Yes.

Q: You really think?

A: I think I could.  Uh-huh.
    I can't say – I can't come out and say fully, yes, I could or, no, I couldn't, because I don't know the circumstances.

Q: That is what I am getting at.  I don't want to give you the circumstances because I don't want you to have to prejudge the facts.  What I am trying to find out is if your general feeling about the death penalty would even interfere with your being able to make a decision about it.

A: I don't think so.  I try not to let it.[4]

---

[4]Petitioner included the entire voir dire by the prosecutor for discussion.  The part omitted by the undersigned in the text again exemplifies the back and forth that Mrs. Casey had with her thoughts on the death penalty.  For completeness, that portion of the voir dire by the prosecutor (beginning) is reprinted in this footnote.

Q. Mrs Casey, do you understand that if we reach a point in the trial where a jury has to decide upon punishment being life in prison or the death penalty, that both sides, the defense and the prosecution, which I represent, are entitled to an unbiased jury.  Do you understand that?
A. Yes.
Q. Now I gathered from your answer to the question on the death penalty that you do not believe in the death penalty?
A. I really don't.  But if it is bad, it really bad and I felt that, you know– I hate death.  I don't know how to express myself, really.  But I really hate to see anybody be put to death.  And I hate to see someone take a life.  I don't care whose it is.  So–it is–it is hard for me to express it.  But I could, if proven to me, to, no doubt, that it was a crime, then I don't think I would hesitate.
Q. You understand, I am sure, from years of watching how the system works, that as a representative of the People, that we are asking for the death penalty in this case.  You understand that?
A. Yes.
Q. Do you think considering your feelings on the death penalty that even before we start giving you evidence in this case, that my side, the side of the People, is at a disadvantage with regard to the death penalty because of your feelings about it?
A. You feel you are at a disadvantage?
Q. Do you think?

The record facts of the jury selection, much of which was previously set forth in the Findings and Order, are detailed in the subsection entitled "Pretext" because the record as a whole is pertinent to that discussion.  For the articulation by the prosecutor of the race neutral explanation, and for other facts pertinent to the "pretext" prong, the undersigned sets forth the following facts developed after Judge Damrell's Order.

*Facts Developed After Remand From District Judge*

Prior to the holding of the evidentiary hearing, petitioner engaged in discovery which included taking the deposition of the prosecutor, Gerald Flannagan.  As related in the undisputed facts adopted by the Pre-hearing Order, set forth below, the prosecutor did not remember *anything* of significance to the exercise of his peremptory challenge.

> 1. He [the prosecutor] alone conducted the trial and exercised peremptory challenges of prospective jurors at the trial of <u>People v. Crittenden</u>.
> 2. He has no recollection of exercising the peremptory challenge to remove prospective juror Manzanita Casey.   He has no recollection of why he removed Mrs. Casey, who is African-American.  He cannot say what he was thinking at the time he exercised the peremptory.
> 3. He does not recall if he used peremptories to remove African-American jurors.
> 4.  He has no recollection of the peremptory challenge process in the *Crittenden* trial, or the final selection of the jury, or of the method used for

---

A. Do I think?
Q. Because of your strong feelings on the death penalty, that my side which is asking of the death penalty is at a disadvantage in this case?
A. I don't really think so.  I don't know.
Q. Do you as you sit there today think that you are completely open and objective about the issue of the death penalty?
A. I try to be.
Q. Do you think?
A. I couldn't say fully.  I would try.
Q. His Honor has told you at an earlier time in the State of California when a person is sentenced to death, that means exactly what it says?
A. Yeah.
Q. That he is supposed to die in the gas chamber.  Do you understand that?
A. Yes.
Q. And, as a juror, sitting on a case such as this, it is up to you along with the other eleven members of the jury to make that final decision as to what the penalty is going to be.  Do you understand that?
A. Yes.
[the voir dire as set forth in the text continues at this point.]

exercising peremptories, or whether he used all of his available peremptories.

5.  He has no independent recollection of the individual voir dire of Mrs. Casey, and cannot say what his personal observations of her were.  He has no recollection of her and he is not able to describe her.  When he reviewed the transcript of the individual voir dire of Mrs. Casey in preparation for the August 26, 2002 deposition, it did not refresh his recollection as to what had taken place.

6.  He has no recollection of what his position was, if any, regarding Mrs. Casey at the conclusion of the voir dire by both sides.

7.  He has no recollection of having challenged Mrs. Casey for cause, and has no recollection of what the basis was for the cause challenge, other than what is in the record.

8.  He does not remember what his general concerns were as he approached selecting a jury in the *Crittenden* case.

***

10.  He does not recall if there were any black people in the original panels of jurors summoned for jury service in the *Crittenden* case, or how many black people were excused for hardship, if any.

11.  He does not recall how many black people were questioned during individual voir dire, or whether there were any other black people in the venire other than Mrs. Casey.

***

13.  He made notations on his copy of the questionnaire of Mrs. Casey. He does not recall whether the notations are the actual reasons he exercised a peremptory to remove Mrs. Casey from the jury.  He cannot say what he was thinking when he wrote the notations.

14.  When he read the California Supreme Court decision in *People v. Crittenden* in approximately May or June, 2002, he did not recall that a peremptory used by him had been the subject of a *Wheeler* motion during the trial, and reading the decision did not refresh his recollection as to what had taken place with respect to Mrs. Casey.

15.  He has no independent recollection of the reasons why he retained Mrs. Gislea Clark on the jury.  When he read the transcript of the individual voir dire of Mrs. Clark in preparation for the August 16, 2002, deposition, it did not refresh his recollection of her voir dire.

16.  *People v. Crittenden* and *People v. Willie Junior Johnson* are the only capital trials he has participated in.

17.  He has no recollection of the *Wheeler* motion in the *Johnson* case.

There is also no dispute that the prosecutor herein was not asked by the trial judge to proffer a race neutral reason after the trial judge found that petitioner had not established a prima facie case.

At hearing, respondent's counsel indicated that he had not stipulated to the above facts, but only that the prosecutor had stated them at deposition.  The court need not decide whether respondent's "clarification" was appropriate in that prosecutor Flannagan testified at the

hearing, and with the possible exceptions of Facts Nos. 8 and 13, did not significantly depart from any of the undisputed facts.  The court finds these facts as *part* of the factual universe pertinent to the <u>Batson</u> issues, but permits the expansion of facts related to Nos. 8 and 13 as set forth below.

The undersigned states from the outset that he found Mr. Flannagan to be credible and forthright in his factual testimony relating his non-recollection and recollections with respect to his systemic practices and the rating system in this case.  Flannagan was not purposeful in his non-recollection, nor was he creating recollections where he really had none.  In general, Flannagan confirmed that he had no recollection for the most part of what he was thinking or observing in the past, except that he did have a recollection of systemic practices that he utilized along with what was meant by certain practices at the time, and a vague recollection of general events, e.g., identities of defense counsel, the presence of the judge, meeting with defense counsel.  He could also identify handwriting/marks on juror questionnaires as his, could read the words, and "translate" his marking system.  The court was careful to permit only that testimony for which Flannagan could actually recollect, or for which his recollection was actually refreshed, and *not* that testimony for which Flannagan was testifying to a *present day* inference of what *he must have been thinking at the time*.  That is, if Flannagan could ultimately recall what he observed, thought, marked, interpreted, practiced etc. at the time of trial, he could testify to that.  If however, he was simply attempting to draw his own inferences from presently reading the exhibits to construct a present day hypothetical scenario of a past event, he was not permitted to testify.  <u>See</u> RT Evid. Hrg. 20, 22, 23, 24, 25, 26, 27, 42, 54, 55, 56, 57, 93, 94, 95, 96.

Thus, even though Flannagan could not recall what he was thinking 15 years ago vis-a-vis a particular juror, it might be perfectly logical for Flannagan to actually recollect a system or methodology pertinent to exercising peremptory challenges in the <u>Crittenden</u> trial, and interpretation of that system, because he had used such for a number of years without significant change, or because the writing/marks on the juror questionnaires were self evident and not

1   seriously open to question.  The critical evidentiary factor would be whether the exhibit disclosed

2   enough about the system or methodology to be useful to a determination of the prosecutor's

3   thinking at the time and not be misleading.

4           On the testimony permitted, the court finds that the term "passed for cause" on the

5   questionnaire cover sheet indicated that the juror had actually not drawn a cause objection, or that

6   the juror had survived a challenge for cause.  In either event, the juror could potentially be seated

7   absent a peremptory challenge.  It is most probable that the "passed for cause" notation was made

8   at a time that the juror had survived an initial hardship inquiry or a pre-voir dire review of

9   counsel.  The handwritten number "56", at the bottom of the questionnaire meant that question

10  56 (an inquiry about death penalty views) had caught Flannagan's attention as he had reviewed

11  the questionnaires *prior to his having met the juror*.[5]  The court does not find that the cartoon

12  doodles on any part of the questionnaires had any significance to the issues before the court.

13          The court further finds that Flannagan's rating of the juror in terms of favorability

14  to the prosecutions case, especially a willingness to impose the death penalty if the facts at trial

15  indicated such should be imposed, or conversely in terms of non-favorable, appeared generally

16  on page two of the juror questionnaire.  The court finds from a review of the entire voir dire

17  transcript that for the most part, Flannagan (and defense counsel) was focused on the death

18  penalty issue during voir dire.   However, the rating was not invariably focused solely on the

19  death penalty issue.  <u>See</u> juror comparisons below.  Moreover, "question 56" or a later annotation

20  of "DP" on page 2 (see below) appeared most frequently as the prosecutor's concern.  If a juror

21  exhibited characteristics, in terms of being a "good" prosecution juror, or conversely a "bad"

22  prosecution juror, even for the liability phase, the comments accompanying the rating system

23  were clear enough to make all notations meaningful to the issues herein.  The court rejects

24  petitioner's assertions that the prosecutor's ratings and notations are not useful in adjudicating

25

26          [5]Other numbers corresponding to the questionnaire appeared as well.

the <u>Batson</u> issues even if a few seem anomalous.[6]   Determination of the issues here is enhanced

by understanding the rating and notations *actually* given to each juror at the time even if counsel

today believe the rating should have been different, or is somehow pretextual.

Thus, "check marks" on page 2 indicated that the prosecutor thought this juror to

be favorable to the prosecution—the more check marks, the more favorable.  Similarly, "Xs"

meant that the juror was thought to be unfavorable to Flannagan—again, the more Xs, the more

unfavorable.  It appears that the maximum rating either way was four check marks, or four Xs.

The prosecutor often made cryptic comments to go along with the rating.  The most frequent

comment had to do with "DP,"—death penalty.  A "DP" set forth on page 2 indicated that the

prosecutor had concerns that the juror could have some type of  problem (mild or otherwise) in

the penalty phase.  The court finds that where legible, the other comments were self-evident and

easily understood.  The notations/comments were made at or about the time that voir dire had

been completed with the juror.

Taking a few illustrative examples will clarify the above.  For example, on juror

Fortier's questionnaire (respondent's Exhibit 3) at page 2, Flannagan rated him as three checks,

but with a possible concern that the juror was "too strong," i.e., too fixed in his opinions or

overbearing in his opinions.  On the other hand, juror Hurst (Exhibit 18) received two Xs and no

comments.  Juror Hunter (Exhibit 20) received two Xs and the comment "teacher, doesn't like

DP."  Flannagan did recall that he had a general aversion to having teachers on the jury.  By far,

more jurors received check marks than Xs.  Indeed, relatively few jurors received Xs.

---

[6]The rating system and understandable notations on the questionnaires were quintessential past recollection recorded. Fed. R. Ev. 803(5). They were "a record" "concerning a matter about which the witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately" "shown to have been made or adopted by the witness when the matter was fresh in the witness' memory and to reflect that knowledge correctly." To the extent that the court had any doubt about the content of the notation, the court has not relied on the exhibit.  Again, the import of the notations are common sense.  The court overruled petitioner's somewhat unclear objection to use of the exhibits and their notations.  RT (Evid. Hrng.) 89.  <u>See also</u> RT 102, 103.

Most pertinent to the past record review of the voir dire, juror Manzanita Casey (the only known African-American) (Exhibit 44) received a four "X" rating, the most unfavorable.  Prior to Flannagan ever seeing her, he noted that question 56 was of concern.  After her voir dire (presumably), he rated her with four [large] Xs and commented: "DP" and "transport[ation] problems" and "can't say if could set aside."  Clearly, the last comment was directed to the juror's death penalty views and not her transportation problems.

The other, comparison juror who received much attention in the prior briefing was Gislea Clark (Exhibit 1).  Clark was voir dired subsequent to Mrs. Casey.  Flannagan did note that question 56 caught his attention as she had starkly written that she was "against" imposition of the death penalty.  Despite the continued hesitance about imposition of the death penalty set forth in the Clark voir dire as expounded upon in the initial Findings and Recommendations and the Order, this juror received *three checks*.  For some reason, although it is not readily evident from the voir dire, the prosecutor had obtained the impression that she "<u>might</u> vote DP;" Flannagan liked this juror because she was "otherwise <u>strong</u>."  (Emphasis in original).  The latter observation is borne out by the voir dire (<u>see</u> Casey/Clark comparison below).

### *Underlying Facts Found by the Undersigned and the District Judge*

Both the undersigned and the district judge (Judge Damrell) found that racial bias was a "significant factor" in the state of the prosecutor's mind when exercising his challenge against Mrs. Casey. Ultimately, both the undersigned and the district judge did not believe that race was the prosecutor's motive in exercising the challenge—the legitimate, death penalty ambiguity exhibited by Mrs. Casey was a reason which would have led a reasonable prosecutor to challenge her.   However, the district judge's underlying basis for arriving at the same conclusion differed somewhat from that of the undersigned.  The undersigned will list each of his explanations, as the undersigned remains of the belief in their accuracy,  and then the district

////

////

17

1   judges's superseding findings, if such were made.[7]

2                    **The "Question "56" Annotation**

3            Flannagan testified that he annotated the cover page of the juror questionnaire

4   with a "56" *prior to voir dire of the juror* if he had noted concerns with the way the juror

5   answered the death penalty questions.  There is nothing about the Casey questionnaire which

6   would have led a reasonable person to conclude the race of the person answering the question.

7   No evidence at hearing demonstrated that Flannagan knew otherwise.  This pre-voir dire concern

8   tends to indicate that Flannagan had a death penalty concern about juror Casey even before he

9   knew her race.

10  *This factor weighs in favor of respondent.*  The district judge did not issue superseding findings.

11                  **Prosecutor's Cause Challenge of Mrs. Casey**

12           As discussed in the Findings and Order, the meritless cause challenge to juror

13  Casey, denied in a one word ruling from the trial judge, evidenced an ulterior motive to remove

14  her.  In other words, the prosecutor appeared too anxious to remove her.  As Judge Damrell

15  found:

16               It was well established at the time the prosecutor challenged Casey
                 for cause that challenges for cause based solely on the fact that a
17               juror 'voiced general objections to the death penalty or expressed
                 conscientious or religious scruples against its infliction' were
18               improper....*No* other jurors who voiced general objections to the
                 death penalty were challenged for cause."

19

20  Order at 27-28 (emphasis in original).

21  However, the undersigned believed that this apparent bias had been mitigated by comparison to

22  other jurors:

23  _____

24       [7]The district judge found that his factual bases for finding a prima facie case were "law of
    the case."  The undersigned did not believe he was bound by these facts at Step 3 of the Batson
25  analysis held after the evidentiary hearing.   What is important here, however, and which will be
    discussed later, is whether even accepting the district judge's findings at the prima facie stage as
26  law of the case, the motivation for striking Mrs. Casey was substantially motivated by bias *given
    the circumstances at when the strike was made.*

> *This factor weighs in favor of petitioner, but is mitigated by the*
> *prosecution's desire to challenge juror Clark for cause, and juror*
> *Moreno's actual challenge for cause.*[8]  Se̲e̲ also juror Smith, R.T.
> 6141-42 examined immediately after juror Casey.

The district judge believed this factor weighed more heavily in favor of petitioner.

> Also, the F&R understates the importance of Flannagan's meritless
> cause challenge of Casey. According to the F&R, and the
> magistrate judge's prior findings and recommendations, filed
> January 29, 1999, this challenge "weighs in favor of petitioner, but
> is mitigated by the prosecution's desire to challenge Clark for
> cause, and juror Moreno's actual challenge for cause." F&R at
> 24-25. However, the May 13 M&O implicitly rejected the F&R
> findings by concluding that the use of the meritless cause challenge
> against Casey contributed to a prima facie case of racial
> discrimination. The MO found persuasive the fact that "No other
> jurors who voiced general objections to the death penalty were
> challenged for cause." M&O at 28 (emphasis in original).
>
> Finally, in the F&R the magistrate judge concluded that he "cannot
> ascribe a discriminatory animus to the prosecutor in the Casey
> challenge based on a challenge in [the Willie Junior Johnson] case
> which the trial court found proper." F&R at 39. This same finding
> was made in the January 29, 1999 F&R, and the court rejected it.
> See May 13 M&O at 28. The court stands by that rejection now.

Order at 23.

**The Very Unfavorable Rating Received by Juror Casey**

Juror Casey received a "four X" rating, the most unfavorable on the prosecutor's

scale.  Only one other juror whose questionnaire was presented to the undersigned at the

---

[8]The undersigned had previously found that juror Moreno, se̲e̲ RT 6699-6721, had voiced
only general objections to the death penalty, but was challenged for cause.  Findings (Vol.1) at
44, 46.  Moreno had written "undecided" on her questionnaire about her views on the death
penalty, Exhibit 32, and through the course of voir dire indicated that she had problems with the
death penalty, but would impose it if that was the decision she would have to make under the
instructions and the facts.  She did say that she would not want to be the foreperson of the jury in
any event because the foreperson had to sign the death verdict.  Flannagan challenged her for
cause because she could not sign the death penalty verdict as foreperson (although she on several
occasions related that she could vote for it) and because she was "undecided about her feelings
about the death penalty."  RT 6721.  The undersigned remains of the view that juror Casey was
not the only juror challenged for cause because of general scruples against the death penalty, and
this mitigates the bias potential arising out of Casey's challenge for cause.

1   evidentiary hearing[9] received such a rating, juror Lois Smith.  Petitioner's point, and it is a good

2   one, focuses on the fact that in all other respects, juror Casey was an ideal juror from the

3   prosecution standpoint.  Petitioner argues that the forcefulness of the negative rating could only

4   have been instigated by the fact of Casey's race.

5   　　　　　As related above, the main focus of the voir dire, and especially that of juror

6   Casey, were her views on the death penalty.  RT (Evid. Hrng.) 31-32.  However, within that

7   parameter and in general, the prosecutor, Flannagan, was looking at "people's backgrounds,

8   whether they're employed, homeowners, what they had to lose. [The prosecutor] wanted people

9   who had something to lose in society, who might be victims of crime, solid citizens, preferably

10  fairly well educated" [but not teachers].  RT (Evid. Hrng.) 14.  These same factors were in play

11  when juror Casey was rated.  RT (Evid. Hrng.) 26.  Nevertheless, it was possible for an otherwise

12  "good juror" to be rated for rejection, based on death penalty views.  See below.

13  　　　　　However, petitioner's point is that the "force" of the rejection of juror Casey

14  embodies the motivation to rid the panel of its only African-American.  The district judge has

15  found, and the undersigned certainly agrees, that death penalty aside, juror Casey was the

16  epitome of what Flannagan was generally seeking in good juror material.   As evidenced by her

17  questionnaire, Exhibit 44,  Casey was a middle class person who had something to lose if a

18  victim of crime.  She expressed her concern over crime, especially drug related crime.  Her

19  husband was a state worker who had also served in the military.  Casey read magazines such as

20  *Better Homes and Gardens*, *Reader's Digest, Women's Day*– not exactly one's anti-

21  establishment reading list.  Although Casey did not respond to questions on her educational level,

22  Casey's interest in television programs such as *"Sixty Minutes"* demonstrated a significant

23  ////

24

25        [9]Evidently, not all juror questionnaires were presented at evidentiary hearing.  The vast

26  bulk of juror questionnaires were jurors who sat in the box and were peremptorily challenged, or
     ultimately chosen.

intellectual level.  Last, but not least, Casey was not, nor had she been, a teacher.[10]

The court will engage in a comparative analysis of juror Casey with other potential jurors below, but based simply on her own responses, and the prosecutor's predilections with respect to picking jurors, Casey did not rate a "four X" score based on what she had related on the questionnaire and voir dire.  She was not adamantly opposed to the death penalty, although any reasonable prosecutor would have been concerned with her voir dire responses in this respect, and her attributes in other areas indicated that she was a "keeper."  A one or two "X" rating was reasonable based solely on her death penalty views, and the court can understand the reasonable argument that Casey may never have avoided a peremptory challenge because of her, at best, indecisive, negative death penalty views, no matter how favorable she appeared in other areas.  However, to reject this juror as the "worst of the worst" appears to be unexplainable overkill—unexplainable unless one attributes a discriminatory motive, be it conscious or sub-conscious, to Flannagan's rating.[11]

*This factor, without other juror comparison, weighs in favor of petitioner*.[12]   The district judge did not issue superseding findings.

### The Prosecutor's Manner of Questioning

The manner of the prosecutor's questioning may be relevant to a finding of whether the prosecutor harbored racial animus when exercising his peremptory challenges.  Miller-El v. Cockrell, 537 U.S. 322, 344. 123 S.Ct. 1029, 1043 (2003).  Mirroring petitioner's

---

[10]In reviewing all of the juror questionnaires, it also appears that the prosecutor disfavored social workers.  Mrs. Casey was not a social worker.

[11]The court does not place much stock in petitioner's argument that because the "X" marks given Casey were larger than other juror's "X" marks, this shows how badly Flannagan desired to be rid of Casey.  No one at the evidentiary hearing could testify to such significance, and such an argument smacks too much of Rorschach testing by an amateur psychologist.  In any event, other X'ed jurors received large Xs.  See e.g., juror Works, Exhibit 34.

[12]The purported travel problems that this juror might have had were not fleshed out, have not been demonstrated by respondent as an articulation of a significant reason for rating Casey so poorly, and will be given no credence by the undersigned.

21

1  allegations here, the Supreme Court found possible fault with the very explicit description of the

2  death process utilized with African-American jurors, but with only a handful of non-black jurors.

3  (Although the disparate questioning here was not performed in any way to the degree manifested

4  in Miller-El).  In finding a prima facie case in this case, the Order focused upon prosecutor's

5  Flannagan's use of the term "gas chamber," a term not utilized according to petitioner with any

6  other juror.

7         However, respondent has accurately pointed out that the *trial judge first* utilized

8  this term a relatively short time before the Casey voir dire with juror Shalley.  RT 5204.  Thus, it

9  might not be viewed as discriminatory that the prosecutor simply picked up on the judge's

10  language in a later voir dire.

11         Moreover, petitioner obliquely argues that the prosecutor was much more pointed

12  and lengthy in his questioning with juror Casey than he was with other jurors.  This is not to be

13  completely unexpected, because, as discussed at length below, juror Casey was more equivocal

14  in her death penalty responses than the large majority of other jurors.   Indeed, the defense took

15  slightly longer in questioning Casey than did the prosecution.  RT 6109-6114 (defense), 6114-

16  6119 (prosecution). Such equivocation would necessarily lengthen and sharpen the focus of the

17  questions.  The court has also undertaken an extensive review of the "X" jurors below, and does

18  not find that the prosecutor's manner of questioning exhibited significant differences when

19  compared with other equivocal jurors.   The court could take pages of comparison voir dire, but

20  one example will suffice—that of Lois Smith, the other four "X" juror: "Q. So, if I chose you to

21  sit as a juror in this case would it not be taking a chance that the evidence I produce would not

22  comport with what you already have in your mind as what a death penalty case is?"  RT 6139.

23  That is a fairly pointed question.

24  *This category is neutral.*  The district judge disagreed, but only with respect to the prosecutor's

25  reference to the gas chamber with Mrs. Casey.

26         [T]his court concluded in the May 13 M&O that Flannagan's

1    mentioning the gas chamber to Casey constituted disparate
     questioning and supported an inference of discrimination, yet the
2    F&R concluded it was a "neutral" actor with respect to its ultimate
     finding on the issue of discriminatory intent.  F&R at 28.
3

4  Order at 22-23.

5              **Comparison in Ratings between Jurors Casey, Clark and Krueger**.

6      <u>Juror Clark</u>

7              Much has previously been made of a comparison between juror Clark and Casey

8  based only on voir dire responses when assessing the prima facie case.  <u>See</u> [February 29, 1999]

9  Findings and Recommendations at 40, 46-48; [May 13, 2002] M&O at 29.  However, we now

10 know that Juror Clark, who was very similar in background and hesitance on the death penalty

11 vis-a-vis Casey was rated with *three* ✓✓✓.  Exhibit 1.  We also know that the prosecutor was

12 disappointed enough in the Clark voir dire at the time that he expressed his frustration in not

13 being able to challenge her for cause.  RT 6408.  (The Clark voir dire took place after Casey's,

14 and the prosecutor had evidently learned from that denial).   One might have expected Clark to be

15 in the "X" category based on her death penalty responses.

16             However, there was something about Clark which the prosecutor liked.  He wrote

17 in his notes—"<u>might</u> vote DP otherwise <u>strong</u>" (emphasis in original).  The prosecutor's

18 contemporaneous notes corroborated the independent reading of the voir dire by the undersigned,

19 where Clark seemed to exude decisiveness outside of her hesitant death penalty views.  F&R at

20 46-47.   The point here is not whether all reasonable prosecutors would agree with Flannagan's

21 Clark rating; the point is whether the discrepancy between Casey and Clark indicates racial

22 discrimination.  While a comparison limited to Casey and Clark *by itself* would lend quite a bit of

23 weight to petitioner's inference of discrimination, the anomaly in the scores between these two

24 jurors is so extreme so as to reduce its significance in petitioner's favor because the *Clark score*

25 *was anomalous with respect to the other "X'ed" jurors as well, not just Casey.*  <u>See</u> <u>below</u>.

26 Indeed, it was also anomalous with respect to three plus jurors.  Based on the fact that the Clark

                                                23

1  discrepancy seems too extreme in the context of *all* juror questionnaires and voir dire, the

2  significance of the discrepancy fades for the purposes of this case.

3  *The undersigned cannot find that this comparison favors either side.*

4        The district judge believed the juror comparison of Casey vs. Clark informative,

5  but such was stated in the context of the district judge findings that the rating system was very

6  important, and indeed the primary motivator of the exercise of peremptory challenges.  Order at

7  25.  Indeed, the district judge did not consider Clark's rating an anomaly (although the district

8  judge did believe that Casey's and Clark's death penalty views were dichotemous), and favored

9  an inference that Casey's extremely negative  rating had been biased.  The district judge's

10 findings in this regard will be quoted in that section concerning the rating system.

11        Juror Krueger

12       Petitioner points with emphasis to Juror Krueger (++ and ½+)  as another

13 otherwise prosecution oriented juror that "should have been challenged" because of her death

14 penalty views, and compares her with juror Casey.  If looking only at the juror questionnaire,

15 petitioner is correct.  Krueger answered question 56 with:  "No one should receive death

16 penalty."  However, in question 57(e), she stated that she could set aside her personal feelings.

17       She portrayed quite a different person at voir dire.  In response to the judge's

18 question about whether she had such an opinion that would preclude her from voting for the

19 death penalty, she responded, "No.  I think I would be able to vote for the death penalty."  RT

20 7376.  She assured the judge that she could act impartially for both sides.  RT 7377.   After a

21 long explanation of aggravating factors and mitigating factors, where defense counsel summed

22 up: "And the jury hears evidence on both sides, and considers and weighs those.  And if the jury

23 finds that the aggravating factors so substantially outweigh the mitigating factors, that they feel

24 death is the appropriate verdict; that's the verdict they return.  Otherwise, life without possibility

25 of parole.  In that framework, I assume you don't have any problems with your ability to serve as

26 a fair and impartial juror?"  She responded: "No, I would not have any problem with that."  RT

7385.  Later, she was questioned by the prosecutor and explained her Question 56 response as one that there might not be much need to impose the death penalty because life in prison was "close to death" already.  RT 7391.  The questions continued:

> Q. So beyond a reasonable doubt, any reasonable doubt, you would
> have already found–
> A. Yes.  That–
> Q --him to be guilty?
> A.  That this individual was guilty.
> Q.  Okay.
> A.  *Then I would be able to vote for the death penalty.*

RT 7392 (emphasis added).

***

> Q.  You understand that the People in this case are asking for the
> death penalty?
> A.  Yes, I do.
> Q.  And obviously, the Defense in this case, should we get that far,
> would want you to vote for life without the possibility of parole?
> A.  Yes, sir.
> Q.  And you think at this stage, as of today, that you could give us
> both the benefit of your undivided feeling and intent, and base your
> decisions solely upon the evidence and His Honor's instructions?
> A.  Yes, I would be able to.

RT 7393.

Petitioner's taking of an ambiguous comment about the State of Texas (a comment that was made in the context of both race and death penalty ("and you know I'm not in agreement."  RT 7379–80), and her general feeling that she "would be more toward the life imprisonment versus death," RT 7383, does not fairly characterize the entire voir dire.

If voir dire can be used to demonstrate that Mrs. Casey was perhaps not as anti-death penalty as question 56 might otherwise indicate, it can certainly be used here to demonstrate the same.  In comparison between the two voir dires, there can be no doubt that juror Krueger was a demonstrably more favorable prosecution juror vis-a-vis the death penalty than Mrs. Casey.  The prosecutor's final voir dire evaluation of juror Krueger was not out of line with her voir dire. ( And, it should be noted that this sitting juror's vote for the death penalty

25

confirmed the prosecutor's analysis.)

*These comparisons are at least neutral, and could be viewed as favoring respondent.*  The

district judge did not agree:

> Likewise, a comparative analysis between Casey and juror Mary Krueger is similarly instructive on the issue of discriminatory intent. On Krueger's questionnaire, Flannagan wrote "NO DP for anyone." EH Exh. 5 (capitalization in original). In response to question 56 ("What are your GENERAL FEELINGS regarding the death penalty?"), Krueger stated: "no one should receive death penalty." She also indicated, in response to question 57, that she felt the death penalty was used "too often." Finally, in response to question 17, which inquired about her involvement with criminal cases, Krueger indicated that her sons had been arrested. RT 7379.
>
> Based on Krueger's answers, arguably a prosecutor would give her a more negative rating than Casey, though the two were otherwise demographically similar. Krueger lived 14 years at the same address (Casey lived 17 years at hers); she was 45 years old (Casey was 58); both of their husbands were veterans, and both husbands were employed by the government; neither had prior jury experience; both had two adult sons; and both thought drugs were the primary cause of crime. EH Exh. 5 and 44.
>
> During her voir dire, Krueger, like Casey, expressed her opposition to the death penalty but indicated that she thought she would be able to impose it. RT 7376, 7391-93. However, Krueger emphasized to the court that although she was originally from the State of Texas, she was not in favor of the death penalty. In fact, Krueger stated, "I would think that I would be more toward the life imprisonment versus death." RT 7383.
>
> Despite Krueger's hesitancy toward the death penalty, Flannagan rated her as ✓✓1/2 ✓. EH Exh. 5. Krueger exhibited qualities that Flannagan liked, which apparently outweighed her negative feelings on the death penalty. As the May 13 M&O noted, the purpose of comparative analysis is to determine whether jurors like Krueger and Clark were "sufficiently 'similar' or 'comparable' such that the striking of Casey, and not Clark or Krueger, provides substantial evidence that Casey was removed on account of her race." M&O at 31.  See Turner v. Marshall, 121 F.3d 1248, 1251-54 (9th Cir. 1997). Again, this factor strongly supports a finding that race played a significant part in the prosecutor's decision to challenge Casey.

Order at 27-28

*////*

26

**Comparison with Other Jurors Who Received an "X" Rating**

An important comparison, one not performed by petitioner or respondent, places juror Casey in the context of other jurors who received "X" ratings. That is, was Mrs. Casey's placement in the "X" category an ill fit in light of the other jurors put in that category. The undersigned has performed that comprehensive review. Two points become evident as the comparison is performed: (1) Casey did not deserve a "XXXX" rating (*favors petitioner*); however, (2) Casey was not an ill fit in the "X" category in general (*favors respondent)*.

Joy Bertrando XXX- Exhibit 46–

Question 56– "Sometimes in very terrible crimes I have felt that it might be justified, but that is just an angry reaction. Actually, I think life imprisonment is worse punishment. I also think that killing people isn't right no matter who is doing it."
but see –question 38 (a) "I feel this country is too lenient about crime"
Prosecutor Comments– "DP 'thinks' could base[d] on facts"

Voir Dire--RT 6256 start

When asked whether she could impose a death sentence: "Well, I would–that is–well, I feel–I feel somewhat strongly against the death penalty, but I suppose I am not–I am not just so absolute about it that–I wouldn't–that is so hard." RT 6260. In response to Defense counsel's questions, she related that she would follow instructions regardless of her views; however, upon questioning by the prosecutor she opined–how difficult a situation it was, and could only muster an equivocal– "I think I could," RT 6278, when asked if she could approach the decision from a neutral position.

The answers of this juror are similar to those elicited of Mrs. Casey.

Lois Smith XXXX- Exhibit 16

Question 56– "I do not believe in it as a general rule–there are exceptions"
Welfare worker; had questions about the fairness of the legal system
Otherwise favorable

Voir Dire RT 6121 start

"It is horrifying," <u>id</u>.–in answer to question about the prospect of being on the jury
RT 6125. In other questions concerning her feelings about the

1       death penalty, RT 6125-26, she related– "It is hard to–semantics
are–confusing..  I don't think I would have a difficult time if I

2       really believed that it was the correct action."  "I couldn't say
never.  No.  There might be circumstances in which I would."

3

4  Arguably, this four "X" juror was more disposed to render a death penalty verdict than Mrs.

5  Casey.

6  Robert Hurst XX– Exhibit 18

7       Q 56– "It's OK."

8       Voir dire RT 5735 start

9       Hurst answered "no" to the question whether he had a
conscientious determination that would preclude him from voting

10      for the death penalty, RT 5742; he could keep an open mind about
the death penalty, RT 5747

11

12  Karen J. Hunter XX–Exhibit 20

13      Question 56–"In certain circumstances it could be warranted.  I'm
reluctant to say that I'm wholesale for the death penalty"

14      Prosecutor written comments after voir dire–"teacher, doesn't like
DP"

15

16      Voir Dire RT 5959 start

        She could vote for the death penalty, RT 5963;  "If I really felt

17      strongly that all the evidence warranted a decision and the Judge
has so instructed us, then I would have to do that.  I would have to

18      give that [death] judgment."  RT 5968

19  Donald Gilbert XX–Exh. 22

20      Question 56–death penalty could be imposed in rare cases where it
fits

21      Prosecutor written comments–"if OK, will never vote DP"

22      Voir Dire–RT 5496 start

23      "I'm an extremely liberal person,"  RT 5500;  "I would have a
difficult time voting for the death penalty,"  RT 5502; "Maybe" he

24      could impose the death penalty, but would have a "very difficult
time." RT 5504-5505

25

26  *////*

This juror seemed "worse" than Casey from a prosecutor's viewpoint in terms of death penalty responses.

Mary Haffly X–Exhibit 24

Question 56–(response illegible)

Prosecutor written comments–"too young" "says could do death penalty"

Voir Dire RT 5140 start

The voir dire supports the prosecutor's notes. This juror stated that she could vote death penalty; she did not seem to have too much of a problem with it; on other hand she was "not looking forward to it," RT 5147. She would have voted for Briggs initiative (reinstituting the death penalty in California). RT 5152

This juror was clearly an "X" only because she was young.

Nancy L. Pisarek X– Exhibit 26

Question 56–"Generally, I am against the death penalty. It is the law tho + [and] I can see where I could support it..."

Voir Dire 6479 start

This juror was a bit anxious to make a decision on someone else–"I could vote for the death penalty, but I am generally opposed to the death penalty. But I could, because it is the law...." RT 6483.

William Lloyd Henley X and ✓–Exhibit 28

Question 56–"There are times and circumstances when I have considered it appropriate"
Prosecutor written comments– "'Borderline' DP weak"

Candice Works XXX (and pretty large Xs)–Exhibit 34

Recovery Counselor
Q 56–"All life is precious–But I will keep an open mind"

Voir Dire RT 5903 start

This juror was a recovering addict/alcoholic; she thought the legal system to be unfair.
With respect to the death penalty, she could vote for it in some cases, but– "You know, honestly, I don't know. I really can't

project;" RT 5908; she could "conceive of a situation where she would," RT 5913; she would not refuse to vote death penalty on a "conscientious ground," id.  She told the prosecutor that she was not "uncertain" about the death penalty, she  just wouldn't say whether she would vote for the death penalty in this case or not.  RT 5918.

While the undersigned has found that the prosecutor exercised his peremptory challenge against Mrs. Casey in part because of discriminatory reasons, the undersigned also finds that juror Casey belonged in the "X" category.  The court reiterates some of Casey's answers that so persuade the undersigned for comparison purposes.

Q: Do you honestly believe, considering what your feelings are toward the death penalty, that you could vote for a verdict which would mean that this gentlemen here, Mr. Crittenden, would be executed in the gas chamber?

A: Could I vote –

Q: Yes.

A:  – for it?
      I can't sit here and really say for sure if I could.
      But, if it is proven to me, truly proven to me, and I feel deep down inside that   he did it, I could.  I think I could.

Q: You think you could?

A: Yes.  I have to say I think I could.  This is all new to me.  So I am very upset with it.

***

    Do you think that your feelings about the death penalty – in other words, that you don't believe in it – would make it difficult for you to make a decision regarding the death penalty?

A: Yes, I think it would.

Q: And, do you think it might substantially impair your ability to fairly evaluate all of the evidence regarding the death penalty?

A: I can't say yes.  I can't say no.  I really don't – don't know.

***

Q: That is what I am getting at.  I don't want to give you the

30

circumstances because I don't want you to have to prejudge the
facts.  What I am trying to find out is if your general feeling about
the death penalty would even interfere with your being able to
make a decision about it.

A: I don't think so.  I try not to let it.

The "I don't know(s)," the "I think so(s)" and the "I'll try(s)" combined with Casey's

unmistakable reluctance to impose the death penalty would, by any reasonable measure when

comparing her to the other "X" jurors, have placed her in an "X" category.  The court recognizes

that in other parts of the voir dire juror Casey was less equivocal, e.g.:

Q. You can conceive of situations in which you might vote for the
death penalty?

A.  Yes.                                    ***

Q. So you are not telling us that in any situation you couldn't or
wouldn't vote for a death penalty?

A. No.

However, the voir dire, judged as a whole, demonstrated repeated doubts on Casey's part as to

whether she could in fact vote for the death penalty if warranted.  Indeed, in the second answer

set forth above, Mrs. Casey expressed that she was not sure she could vote for the death

penalty—that she could so vote—and then back to she did not know.  The prosecutor was not

tasked with the obligation to ignore the doubts and indecision.

*This factor favors both the petitioner and respondent.*

          The district judge believed that the undersigned had meant to imply in this

comparison that the prosecutor's rating system was "solely dependent on the juror's death

penalty views."  Order at 23.  If this were conveyed in the above analysis, the undersigned did not

mean to convey it, nor does the undersigned disagree with the district judge that other factors

////

////

entered into the ratings.[13]  The findings of the district judge are quoted below, and fairly read

indicate the same conclusion found by the undersigned—this factor favors petitioner and

respondent:

> Turning next to certain substantive "factors" reviewed by the magistrate judge, regarding Flannagan's jury rating system, a close look at many jurors' ratings illustrates that Flannagan's rating system was not, contrary to the magistrate judge's conclusion, solely dependent on jurors' death penalty views. Flannagan assigned positive ratings to several members of the jury pool who expressed anti-death penalty views. For example, Suzanne Tennies (✓✓, EH Exh. 58), repeatedly expressed strong anti-death penalty views, and Flannagan noted on her questionnaire "probably wouldn't vote for DP." RT 4992, 4994, 4995, 4997, 4999. In fact, unlike Casey, Tennies was unable to conceive of situations in which she would impose a death sentence. RT 4992, 6108, 6111, 6112, 6114-6115, 6116, 6118.

> Similarly, Francis Sullivan (✓✓, EH Exh. 54) stated he "would automatically and in every case vote for life without possibility of parole and never vote for the death penalty" and "he had reservations about the death penalty." RT 6413.

> Michael Fisher (✓,EH Exh. 50) claimed he was "generally opposed to the death penalty" and stated "where there's an option between a death penalty and life in prison without the possibility of parole, generally, I believe, I would choose the latter option ...." RT 6846. Fisher said he could only conceive of imposing the death penalty in an extreme case of serial murder, stating "good example would be Ted Bundy... somebody who has killed, or allegedly killed, 40 people." RT 6846. When the trial judge asked Fisher if his bias against the death penalty, and in favor of life without possibility of parole, was "based on an absence of information on [his] part at this particular point of the case, insofar as [his] preference between those two entities?" he replied, "No, it is not. It would be easier if it was, but it isn't. It's not relative to this particular case at all. This is just my disposition." RT 6864-6865. When Flannagan asked Fisher if "the People at the outset are at a disadvantage in seeking [the death penalty] with regard to having

---

[13]In fact, as set forth previously, the undersigned had previously found: "However, the rating [of the prosecutor] was not invariably focused solely on the death penalty issue." Perhaps the district judge got this impression from the undersigned's juror comparison which focused upon those jurors who received Xs in addition to Mrs. Casey– the majority of such marks were death penalty related.  See also Findings and Recommendations dated January 29, 1999, Docket #62 at 45: "The prosecutor exercised all 26 of his peremptory challenges.  He did not strike only anti-death penalty jurors; he struck several persons for other reasons even though they had expressed a willingness to impose a death sentence if appropriate."

you as a juror?" he replied, "They could be," since he was "more inclined to give life than death." RT 6860-6862.

Despite their strong anti-death penalty views, Flannagan rated Tennies, Sullivan, and Fisher substantially more positively than Casey. Although each was ultimately struck during jury selection, their positive ratings are additional indicators that Flannagan's juror rating system was not based solely, or even primarily, on jurors' death penalty views. Therefore, the question remains what, if not Casey's death penalty views, explains her "XXXX" rating? This factor weighs strongly in favor of finding that race played a significant part in Flannagan's challenge of Casey.

Second, the magistrate judge did not find a comparative analysis of Casey and trial juror Clark highly probative. However, in the May 13 M&O this court classified such analysis as "substantial evidence that Casey was removed on account of her race." MO at 31. There is a notable difference in the way Flannagan rated jurors Casey and Clark, considering the similarity of their backgrounds and their shared hesitancy on the death penalty issue.  Despite their similarities, the prosecutor rated Casey a "XXXX," while juror Clark received a rating of ✓✓✓.  See Exh. 1. Further, Flannagan expressed his frustration during the voir dire in not being able to challenge Clark for cause, as he had unsuccessfully done with Casey. See RT 6408.  Despite Flannagan's initial hesitancy, he liked something about Clark, writing in his notes: "might vote DP otherwise strong" (emphasis in original).

The F&R underestimates the importance of Flannagan's rating system, even labeling Clark's rating "an anomaly." F&R at 15.  The objective facts, supported by the testimony at the evidentiary hearing, suggest that the prosecutor did not primarily rely on jurors' death penalty views in the jury selection process, as the F&R suggests.

However, the facts do suggest that, in selecting jurors, Flannagan substantially relied upon his rating system. For example, Flannagan left Clark (✓✓✓), and other ✓✓✓-rated jurors, on the jury. Notably, when given the opportunity, Flannagan exercised a peremptory against every X-rated juror he could remove. When no X-rated jurors were available to strike, Flannagan removed single-✓ jurors. [footnote] In fact, every juror who sat on the trial jury received a rating of at least ✓✓, and all but two jurors scored even higher. Therefore, Clark's rating cannot be dismissed as an "anomaly," and a comparative analysis between Clark and Casey is instructive as to whether Flannagan's dismissal of Casey was racially motivated.

////

33

[footnote] The prosecutor's juror ratings and his challenges, in the order in which he exercised his peremptories, follow. The court notes that because the trial court used the "modified struck system" to select the final jury (as a juror was removed, a panelist was selected from the pool to take the struck juror's place), an X-rated juror may appear in the pool late in the selection process: Smith (XXXX); Hurst (XX); Hunter (XX); Gilbert (XX); Haffly (X); Pisarek (X); Henley (X- ✓); Anderson (✓); Moreno (✓); Works (XXX); Testa (✓✓); Thelan (✓); Culbertson (✓✓); Lester (✓?); Casey (XXXX); Bertrando (XXX); Rehm (✓); Fisher (✓); Shalley (✓); Murillo (no rating); Sullivan (✓); Brand (✓✓); Tennies (✓✓); Naess (✓); McMullin (✓✓); Bell (✓).

[Krueger analysis quoted above omitted here]

Additionally, comparing Casey to panelist Lois Smith, the only other juror to whom Flannagan assigned a XXXX rating, is also instructive. A review of Smith's voir dire indicates why the prosecution considered her so unappealing. Smith stated that she had a strong anti-death penalty belief, and found the prospect of sitting on a death penalty case "horrifying" and "frightening." RT 6121, 6138. Further, Smith had a "preconceived notion as to the type of crime or the type of evidence which would allow [her] to vote for the death penalty." RT 6139.

During voir dire, Smith also indicated she might require a higher standard of proof than beyond a reasonable doubt when considering special circumstances. In fact, she failed to give clear answer to the questions about reasonable doubt, indicating to the judge and the attorneys that she had difficulty with the concept of reasonable doubt. RT 6125, 6132-33.

In Smith's juror questionnaire, she indicated a prior bad experience within her family pertaining to law enforcement. During questioning by defense counsel, the reason for Smith's XXXX rating became clear:

Q.     Okay. You had mentioned in your questionnaire that there was some bad experience within your family as it pertains to law enforcement. In that answer were you referring to the situation with your daughter? [footnote]
A.     No. No. I had a situation quite a few years back where they came to arrest my husband for stealing a bottle of whisky out of a drug store. And, they came to my house. They had witnesses who saw him. And then when they asked to see a picture of my husband, my husband is a white man, and they were looking for a black man. So, it wasn't funny. It was horrendous.
Q.     I imagine it was.
A.     But, I mean, that is the only thing that saved him. He would have been in jail because there was a witness who saw him, you know, get into our car, and we have a black and white

34

dog, and he described the dog. And they still thought it was my husband and - so, I mean, that kind of - horrified me. You know.

Q.     Well, obviously Mr. Flannagan wasn't part of that situation some years ago?

A.     No. It was a long time ago, and hopefully it doesn't happen very often. But -

And I take it there is nothing about that experience that is going to spill over in terms of your ability?

A.     *Only in that I think I would be extra cautious because of it.*  RT 6133-34, emphasis added.

[footnote] Earlier, Smith had revealed that her daughter had been a complaining witness or victim of a crime. RT 6123.

Flannagan was likely troubled by Smith's "extra cautious" approach because an important piece of the government's evidence was testimony by a witness about seeing a black man in the victims' neighborhood near the time of the murders. Witness Rodney Cox lived four houses away from the victims', and claimed to have seen a male fitting the description of the defendant near the victims' home on the date the prosecution claimed the murders occurred. RT 9058. However, when Cox observed defendant Crittenden in a lineup, Cox could not identify him as the man he had seen. RT 6069. Flannagan knew he was going to present this shaky testimony to the jury, hoping they would nevertheless conclude that the man Cox observed was in fact Crittenden. Under these circumstances, it is apparent why Flannagan would want to avoid an "extra cautious" juror like Smith. Therefore, solid justifications exist for Smith's XXXX rating. Although a clear and identifiable reason for Smith's XXXX rating exists, no such justification exists for the "XXXX" rating of Casey. It is puzzling why Casey received the same rating as Smith, when no similarly glaring evidence for prosecutorial disfavor of  Casey exists.

Turning finally to Casey's XXXX rating, one of the two worst juror ratings Flannagan gave. The rating is troubling, since Casey's responses on her juror questionnaire and during voir dire do not seem to justify such a negative rating. Flannagan made several written notations next to Casey's rating, but none satisfactorily explain her rating. First, on the jury questionaire, Flannagan wrote "DP," indicating an issue with the death penalty. As discussed above, while Casey first stated in her juror questionnaire that she didn't "like to see anyone put to death," later when asked whether her feelings about the death penalty would interfere with her being able to make a decision about it, she answered, "I don't think so. I try not to let it." F&R at 10. Certainly, jurors Tennies, Sullivan, and Fisher had equally negative, if not more negative, death penalty views than Casey, yet all received positive ratings.

On Casey's questionnaire, Flannagan also noted that she had "transport problems." EH Exh. 44. Although Casey raised a

concern that she would need to make arrangements to get to the court, after being questioned and reassured by the judge, her transportation issue appeared resolved. RT 6119-20.

Finally, Flannagan made the notation "can't say if could set aside," referring to Casey's views on the death penalty.  However, at no time during her voir dire did she unequivocally make such a comment.[14]

Accordingly, the three notations made by Flannagan, while they indicate some qualities a prosecutor would find unattractive, do not justify Casey's XXXX rating, especially when compared to the other venire members. Therefore, for all the above reasons, and others not discussed herein but analyzed by the magistrate judge, the court agrees with the magistrate judge that race played a significant part in the prosecutor's decision to remove Casey.

Order at 23-31.

**The Make-up of the Potential Jury at the Time of the Casey Challenge**

The undersigned continues with the analysis of the district judge at this point, in that it demonstrates the counterweight to the above finding of bias on the part of the prosecutor. The undersigned will then continue with his final analysis of the most important juror comparison in the case—the comparison of the jurors at the time of the Casey peremptory challenge.

First, while Casey "did not rate a 'four X' score based on what she had related on the jury questionnaire and voir dire," (F&R at 26:14-15), she did nonetheless reasonably deserve a "X" rating based on her death penalty views (F&R at 34-35, recounting key portions of her voir dire testimony). Indeed, Flannagan noted concern about Casey's death penalty views on her jury questionnaire even before he met her. Additionally, judged as a whole, her voir dire demonstrates Casey's repeated and substantial doubts as to whether she could in fact vote for the death penalty. The prosecutor was not, on account of her race, obligated to ignore her doubts and indecision. Nor was the prosecutor the only one to place Casey in the "X" category. The trial judge commented on his perception of Casey in ruling on the "<u>Wheeler</u>" motion, calling her "indecisive" on the death penalty issue and finding that she "couldn't decide whether or not she would be able to follow the law." The judge expected that a "peremptory challenge was going

---

[14]Undersigned's note—It is true that no such express statement was made; however, the gist of Casey's responses are accurately summed up by this notation.  This is made clear by the district judge's further analysis.

to be [made]." F&R at 38:10-13.  Importantly, these factual
comments are entitled to special weight.  [citations omitted]  It is
the trial judge, and not this court, who witnessed her testimony and
observed her demeanor. Moreover, petitioner's defense counsel at
trial conceded on the <u>Wheeler</u> motion that Casey was in a group
who "have expressed views opposing the death penalty or with
their own ability to impose a death penalty." F&R at 39:7-8.[15]
Accordingly, it was not only the prosecutor who would have placed
Casey in the "X" category; the trial judge and defense counsel
placed her in that category as well.[16] *These contemporaneous
observations are critical to this analysis.* [emphasis in the original
and added by the undersigned]

---

[15]The undersigned expressed similar findings.

**"The Trial Judge's Views**

Nor was the prosecutor alone in placing Casey in the "X" category.  Whatever the correctness of
the trial judge's determination not to find a prima facie case of discriminatory use of peremptory
challenges, the trial judge did comment on his perception of Casey herself.

This is a case where a Wheeler motion would be inappropriate, because of the fact
that she is indecisive and cannot guarantee that she would vote a certain way.
And in my language that does not mean that, that (sic) would vote a certain way,
based on the facts.  But that she couldn't decide whether or not she would be able
to follow the law.... And, as such, her wrestling with these issues indicated to me
that; although a cause challenge was certainly not called for, that a peremptory
challenge was going to be expected in any event.

RT 7302-03

... The value of observing *how* a response is made can be very bit as descriptive of a
response as the literal *substance* of the response.  Even assuming arguendo that latter day readers
might reasonably argue, selectively taking textual portions of the Casey voir dire, that she was
decisive with respect to her death penalty questions, or that the trial judge may have been
incorrect in his perception, the point here is that the trial judge also observed *how* Casey made
her responses, something of which the text transcript gives only a partial answer.   That is, "she is
indecisive," her "wrestling with the issues," speaks loudly as to how she answered the questions.
The trial judge kept copious notes of the voir dire so that the Casey challenge was fresh in his
mind at the time of the <u>Wheeler</u> motion.   The law correctly gives great deference to such
observations."

Findings and Recommendations at 38-39.

[16]The undersigned also thought the placement of Casey in the "X" category was critical,
and not a latter day stretch of the facts.

**"Defense Counsel's Views**

Finally, not only the prosecutor and the trial judge would have placed Casey in the
"X" category, defense counsel said as much themselves.  In support of the <u>Wheeler</u> motion,
defense counsel placed Mrs. Casey in a group who "have expressed views opposing the death
penalty or with their own ability to impose a death penalty."  CT 3300-3301."

Findings and recommendations at 39.

1            Where such a valid and well supported race-neutral reason
exists for Casey's challenge, the court cannot find the "real" or

2 "motivating" reason for Casey's removal was her race.

3 Order at 32-33.

4            The undersigned also found critical the make-up of the potential jury art the time

5 the Casey strike was made.  A very important context in which to review the Casey challenge

6 requires a  snapshot of the potential jury at the time of the Casey challenge, i.e., was the Casey

7 challenge ill advised in light of the jurors at that time, or was the jury so prosecution oriented that

8 the prosecutor had little choice but to strike juror Casey.  The court has charted the pertinent part

9 of the jury selection:

10         *Italics*-- indicates a seated but struck juror

11         *(P_)*-- indicates a prosecution challenge

12         *(D_)*-- indicates a defense challenge

13         1. etc.-- indicates the seat which each juror took

14         **Bold**– indicates the jury at the time of the Casey challenge

15         1. *Simmons(D3) Testa(P11) Naake(D11) Thelen(P12)* **Corrao**

16         2. *Fox (D4) Culbertson(P13)* <u>**CASEY**</u>–P15

17         3. **Fisher**

18         4. *Erickson (D2) Paul(D5) Carrington(D6) Cousley(D13) Lester(P14)* **Rehm**

19         5. *Luna(D7) Houck(D10) Martinez(D12)* **Tennies**

20         6. *Lois Smith (P1) Silveira (D1) Henley(P7) Moreno(P9)* **Naess**

21         7. *Roberts(D14)* **Bertrando**

22         8. *Pisarek(P6) Anderson(P8)* **Shalley**

23         9. *Haffley(P5) Shumski(D8) Phelps(D9) Works(P10)***McMahan**

24         10. *Gilbert(P4)* **Stewart**

25         11. *Hurst (P2)Hunter (P3)* **Fortier**

26         12. **Curtis**

1   At the time of Mrs. Casey's Challenge, the jury was comprised of :

2                   Corrao–✓✓✓

3                   CASEY– XXXX

4                   Fisher–✓

5                   Rehm–✓

6                   Tennies–✓✓

7                   Naess–✓

8                   Bertrando–XXX

9                   Shalley–✓

10                  McMahan–✓✓✓

11                  Stewart – {✓}[no rating on the questionnaire but see RT 7735 where the

12  prosecutor called her one of his "good jurors" when she was later excused for hardship after

13  Casey challenge; she would have rated at least a ✓ based on that comment]

14                  Fortier–✓✓✓

15                  Curtis–✓✓✓

16                  Neither Gislea Clark nor Mary Krueger had been seated at this point.  The

17  prosecutor did not challenge Casey the moment he could have; he exercised a challenge to juror

18  Lester ( "✓?" rating) after Casey had been seated.  Bertrando was seated immediately after a

19  defense challenge and after Casey was seated.

20                  It is apparent to the undersigned that the prosecutor, if following his own

21  evaluations, had little choice in determining to strike juror Casey at this point.  The make-up of

22  the jury was pro-prosecution at the time Casey was challenged.  There exists no authority that

23  requires the prosecution to strike a favorable juror in order to maintain an appearance of non-

24  discrimination in not striking a minority when that minority is an unfavorable juror.  And,

25  whether Casey was stricken first, or Bertrando was stricken first (Bertrando was the very next

26  prosecution strike, RT 7283), would seem to make little difference.  The prosecutor would want

both off the jury, and striking them in the order in which they were seated appears reasonable.

Of course, the significance of the above depends on whether Casey was properly in the "X" category at all.  If she should have been a "✓" juror, the prosecutor would not have been faced with a decision to strike Casey or some other "X" juror.  He would have simply struck Bertrando.   Nevertheless, as seems clear from the previous section, Casey's "X" rating (as opposed to the strength of such rating) was not unreasonable at all.  Given that Casey fit into that general strike category, it then becomes apparent that she would have been stricken regardless of her race.[17]

Yes, as petitioner notes, there were a few, very few, jurors who received check ratings which might puzzle the objective observer when reading only the prosecutor notes and transcript years later, e.g. juror Tennies (Exhibit 58) (however, her voir dire was much less strident and she indicated that she, as foreperson,  could even sign the death verdict if warranted). But puzzlement about a few jurors does not indicate that the entire system used by the prosecutor is unfathomable, or that legitimate comparisons cannot be made when viewing the jury selection as a whole.   While the prosecutor may be viewed as "wrong" about juror Tennies, that does not indicate that he was "wrong" in the vast majority of his ratings or wrong about placing Casey in the "X" category.  It should also be noted that the prosecutor ultimately struck juror Tennies.  RT 7228).

*This category significantly favors respondent.*

*Discussion*

1. AEDPA Standards Do Not Apply

It bears repeating that although this habeas petition was otherwise subject to

---

[17]The conclusions to be drawn from the strike chronology also might have been different if the composition of the jury at the time of the Casey strike was primarily unfavorable as far as the prosecutor was concerned.  Then reaching out to strike Casey, as opposed to a significant number of other unfavorable jurors might be viewed in petitioner's favor.  However, the history of the strike chronology cannot be changed to fit petitioner's views.

1   AEDPA strictures, the <u>Batson</u> issue was not reviewed under AEDPA deference:

> 2   [W]hen it is clear that the "[state] courts did not reach the merits of
> 3   the petitioner's constitutional] claim, federal habeas review is not
>     subject to the deferential standard that applies under AEDPA to
> 4   'any claim that was adjudicated on the merits in State court
>     proceedings;'" "[i]nstead, the claim is reviewed de novo." *Cone v.*
>     *Bell*, ___ U.S. ___, 129 S.Ct. 1769, 1784, 173 L.Ed.2d 701 (2009)
> 5   (quoting 28 U.S.C. § 2254(d)).

6   <u>Williams v. Cavazos</u>, ___F.3d ___, 2011 WL 19475744 (9th Cir. 2011)

7   In this case, the state courts never reached the third step of the <u>Batson</u> analysis

8   (pretext) because the state courts ceased analysis with the first step (prima facia case).  An

9   evidentiary hearing was held, and the third step was adjudicated under *de novo* review.  That

10   same standard applies here on remand.

11   2. <u>The Application of "Motivated in Substantial Part"</u>

12   As the Supreme Court has instructed, "the ultimate burden of persuasion

13   regarding racial motivation rests with, and never shifts from, the opponent of the strike."  <u>Purkett</u>

14   <u>v. Elem</u>, 514 U.S. 765, 768, 115 S.Ct. 1769 (1995).  However, this burden applies to the factual

15   presentation; the court has the ultimate duty to get the law right—here, what precisely is the

16   quantum of proof necessary before one has demonstrated a peremptory challenge "motivated in

17   substantial part" by discrimination.

18   As stated previously, the case was remanded to this court to make a determination

19   whether the peremptory challenge was motivated in substantial part by race bias.  But how

20   substantial must a motivation be before it can be said that a peremptory challenge so motivated

21   results in a vacating of the entire trial.  That is, what is the quantum of discriminatory animus

22   which must be shown—de minimis, more than a scintilla but less than a preponderance, clear

23   possibility, or a predominant motive.  Put another way, when does a legitimate reason for striking

24   a juror become so tainted by discriminatory animus that the striking of the juror would be

25   considered motivated in substantial part by the animus.

26   ////

1       The undersigned looks, first and foremost, to the case which instituted the

2   "motivated in substantial part" analysis—Cook v. LaMarque, 593 F.3d 810 (9th Cir. 2010), and

3   which stood as the basis for remand of the present case.  Cook, not argued by petitioner herein in

4   any meaningful way, is especially instructive in that it involved a situation where there was

5   arguably mixed motives for the striking of jurors, and the Ninth Circuit analyzed the reasons

6   expressed by the prosecutor.  The majority in Cook analyzed the prosecutor's reasons for the

7   striking of several jurors.  In applying the "motivated in substantial part" test, the majority

8   utilized a number of explanatory phrases to describe how they were implementing the test:

9   "primary motivation [was race]," id. at 821; "the motivating factor [was valid]," id. at 822, "the

10  valid reason is overwhelming in substance," id. at 824; "significant motivating factor [was not

11  race]," id. at 825; "most significant justifications [were valid]," id. at 826 (cumulative

12  assessment).   The dissent in arriving at a conclusion opposite that of the majority utilized an

13  assessment where the treatment of the African American jurors "contrasted starkly" with the

14  treatment of the non-African American jurors.  To the dissent, the "critical question" involved

15  the persuasiveness of the prosecutor's  justifications (quoting Miller v. El I, 537 U.S. at 338-339,

16  123 S.Ct. At 1040.

17       Distilling all of the above, it appears to the undersigned that when the legitimate

18  articulation(s) of the prosecutor for striking a juror clearly and convincingly predominated in the

19  prosecutor's mind over the discriminatory, illegitimate reason, petitioner has not met his burden

20  of demonstrating that the illegitimate reason motivated the challenge in substantial part.[18] This

21  standard could be phrased in its mirror image form, but judges have more experience in

22  determining whether a fact clearly predominates, as opposed to finding whether a fact is less than

23

24       [18]This is *not* the application in different clothes of the "one-good, one-bad" analysis
    utilized previously.  That analysis ultimately uses an objective basis to demonstrate that whatever
    the substantiality of the prosecutor's motivation for exercising the challenged strike, a strike

25  would have been made in any event by a reasonable prosecutor.  Here the focus remains on the
    believability and weight of the prosecutor's articulated justifications *in this case* based on the

26  evidence of record.  This is precisely what Cook illustrates.

1  probable, but substantial nevertheless.  In any event, judging the persuasiveness of the legitimate

2  factor on a clear and convincing basis gets all to the same point in this analysis as judging the

3  nature of the illegitimate factor.  Indeed, as shown above, Cook itself primarily looked to the

4  predominance of the legitimate factors in employing the new standard.

5       This showing of the prosecutor's mind can be made from direct evidence as to

6  that state of mind (not available in this case), or circumstantial evidence.  Indeed, from the

7  undersigned's experience, in most situations where the finding of discriminatory intent, or its

8  absence, is necessary, circumstantial evidence is the most important evidence.

9       The undersigned has reviewed a myriad of Ninth Circuit (unpublished) and

10  district court cases citing the Cook motivated in substantial part test.  However, the vast majority

11  were unhelpful to the analysis here in that the ultimate assessment determined either that the

12  reason(s) chosen by the prosecutor were entirely suspect, or entirely non-pretextual.  There were

13  very few cases where the situation of found mixed motives were arguably in play.  One possible

14  case was Munoz v. McDonald, 2011 WL 569889 (N.D. Cal. 2011), which utilized an analysis of

15  "most significant justifications were entirely sound," but it is difficult to decipher whether the

16  court in Munoz ever found that the prosecutor was motivated in part by discriminatory animus.

17       Also considered for utilization here, but ultimately rejected, were other areas of

18  the  law in which "substantial" was the lynchpin for assessing the issue, e.g. the "a substantial

19  factor" causation standard in tort law; whether retaliation "substantially motivated" the actor's

20  decisions (civil rights actions), Social Security law "substantial evidence" test.  However, these

21  tests designed for use in totally different contexts were not as persuasive as the actual

22  explanations set out in the Cook case.[19]

23       3.  The Substantiality of the Motivation May Vary At Different Times

24       Whether a discriminatory state of mind was a substantial motivator in the acts of a

25  

26  ──────────────
   [19]See e.g., Consalo v. Federal Maritime Commission, 383 U.S. 607, 619-20, 86 S.Ct.
   1018 (1966) (substantial evidence is "something less than the weight of the evidence.")

1  person, or the mirror image utilized here, whether a legitimate reason "clearly predominated,"

2  depends on the circumstances in existence at the time the act is performed.  Here, the question on

3  remand, the pertinent act, involves the peremptory challenge of juror Casey.  The state of mind of

4  the prosecutor at this point, and whether bias was a substantial motivation for the strike

5  necessarily is pinpointed at the time of the strike.

6          This common sense proposition is best illustrated by a hypothetical divorced from

7  the facts of this case.  Assume that an employer has indicated through unambiguous statements to

8  others at the commencement of a hiring process that his company would be better off if persons

9  of a particular race, religion or gender were not working there.  One could label this

10  discriminatory mindset "substantial" at the commencement of the process.  However, also

11  assume that during the interview process,  a person with the "wrong" characteristics conceded

12  that he had misrepresented his criminal history background on the application, and that in fact he

13  had been convicted on several occasions of serious fraudulent conduct in connection with

14  working with similar businesses.  The employer immediately told the applicant that his services

15  were not needed.   While the unlawful mindset at the commencement of the process was

16  substantial, quaere whether it remained so at the end of the interview, and whether the abrupt

17  termination of the hiring process for this applicant/interviewee was "motivated in substantial

18  part" by bias at the time of the action in question.  Probably not, because the legitimate factors,

19  need for honesty, and fear of further criminal acts in his business, so clearly would predominate

20  in the employer's mind.

21          The same dichotomy is present in this case.  While one could say that the

22  prosecutor's bias in this case (not to have an African American on the jury so as to preclude any

23  possible commiseration at verdict time) substantially motivated the challenge for cause, the

24  circumstances present at the time of the peremptory challenge may have mitigated the effect of

25  ////

26  ////

the bias quite a bit.[20]

This is not to say that the initial bias is not probative of the question at the time of the challenge; it may be very active at the time.  However, it is to say that this bias must be assessed in light of the other circumstances *at the time of the challenge*.

4. The Decision in this Case

Clearly, based on the factual recitation set forth above, the prosecutor had dual motives at the time he challenged Mrs. Casey *for cause*, and one of those motivations was bias. The court will not repeat the previous analysis of the pros and cons for the existence of that bias, but the "XXXX"  rating of Mrs. Casey as a suitable juror, especially as analyzed by the district judge, could only lead one to a conclusion of significant bias.  In addition, the district judge compared marks given to other jurors and found that Mrs. Casey's grade could not be justified in light of the similarity or dissimilarity of compared juror attributes.  The fact of bias has been previously established and will not be revisited here.  And, based on the analysis of the district judge, as well as the undersigned, one would have to ascribe a substantiality to it at the time the challenge for cause was made.

However, additional, significant circumstances existed at the time of the *peremptory* challenge.  As set forth previously herein, those circumstances were the composition of the prospective jury panel at the time of the challenge.  If juror comparison is an important aspect of analyzing juror challenges, and it unquestionably is, the most important comparison at issue occured *at the time of the challenge,* and involved the other jurors who could be stricken at the time of the challenge.   It is that panel composition which could most likely lead one to believe that bias substantially motivated the challenge, or did not.

Both the undersigned and the district judge found that the marking system was *the* standard on which the prosecutor was exercising challenges. One can debate the precise attributes

---

[20]Nothing in the record of this case, and nothing at the evidentiary hearing, indicated that the prosecutor had a bias against African Americans in all aspects of his life.

which would have placed a particular juror with a higher or lower mark, but for the vast number

of jurors who had received marks, the grades were justifiable.   Given Mrs. Casey's ambivalence

as to whether she could ultimately vote for death if warranted, it is indisputable that Mrs. Casey

was not a good juror for the prosecution's sentencing case (as opposed to liability).   It is further

not reasonably disputable that *all* actors present at the time of the challenge viewed Mrs. Casey

as a poor prosecution juror (sentencing phase), and the defense counsel expressly conceded so.

Both the undersigned and the district judge (and inferentially the trial judge and defense counsel)

found that Mrs. Casey could easily have been found "X" by this prosecutor or any non-biased

prosecutor.   Comparing the then sitting jurors with Mrs. Casey, her unacceptability even at a

lower level than four "X"'s, *in view of the clear acceptability of the other jurors,* had to be the

clearly predominant reason for the prosecutor's peremptory challenge in this case.

        Did this conclusion have to be so if other jurors had been in place at the time of

the challenge?  No.  If a number of the jurors at the time of the challenge had been rated as low

as Mrs. Casey in the range found appropriate, i.e., one "X," and Mrs Casey had *still* been

stricken, *then* one could come to a conclusion that the striking of Mrs. Casey had more to do with

race than the bona fide reason, or at the very least, the strike would have been substantially

motivated by race because one could not find a bona fide reason that clearly predominated.  This

conclusion was also found in the previous Findings.  <u>See</u> footnote 17 herein.  However, the

opposite set of circumstances actually existed, and one can say given the circumstances at the

time, that the bona fide reason clearly predominated in the prosecutor's mind.

        There is some contemporaneous corroboration for this conclusion.  Most

importantly, the prosecutor knew at the time he was making the peremptory challenge that the

defense was lying in wait for him to make the challenge; the prosecutor knew that his life was

going to get complicated with a collateral issue if he made the challenge.  This had been

announced by the defense.  <u>See</u> Findings and Recommendations dated January 29, 1999, Docket

#62 at 38; <u>see also</u> RT 4403-4404.  Even the trial judge had been sensitive to the potential <u>Batson</u>

issue and made notations concerning such at the time of the Casey questioning.  RT 7302.  It is reasonable to infer, and the inference chosen by the undersigned, that the prosecutor had to have reassessed just how strongly he felt about Mrs. Casey's death penalty views in light of the accusations of bias that would inexorably be made against him.  Such must have given him pause because he did not strike Mrs. Casey right away.  He struck another juror, but when a "sure strike" replaced this person, , i.e., a person with greater than one "X" unacceptability, the jury was getting sour for the prosecutor and he went ahead and struck Mrs. Casey, and thereafter as soon as possible, the newer, and equally or greater poor replacement.

The undersigned concedes that petitioner can fashion other inferences unfavorable to the prosecutor.  For example, petitioner could speculate that the prosecutor waited one round to challenge Mrs. Casey "just to look good" so as to hide his true motivation.  But that speculation cannot match the proven facts about how the prosecutor used his grading system throughout the jury selection process.  *He did not fail to strike an "X" if he had a chance to do so.*

At hearing, petitioner's counsel could not address the scenario that actually existed at the time Mrs. Casey joined the potential jurors in the box; rather, his argument was that the peremptory challenge had also been made, in effect, when the prosecutor made the challenge for cause.  But this argument ignores that the prosecution had bona fide motivations for not desiring Casey even at time of cause challenge, and assumes that the circumstances afterwards facing the prosecutor in balancing his motivations at the actual time of making the peremptory challenge were irrelevant in assessing substantiality.  Again, this balancing of motivations is not static, but is rather a dynamic process dependent on the circumstances at which time the balancing would be made.

Petitioner correctly focused the undersigned on his comments, and those of the district judge in adopting the previous Findings and Recommendations, that the prosecutor's bias motivation was termed "significant."  Use of the word "significant" can be fairly synonymous

1    with the word "substantial."  As seen above, the district judge at one point used them in close

2    proximity.   However, the focus must be made in the proper context.  In employing the now

3    discarded "mixed-motivation test, i.e. the <u>Mt. Healthy</u> doctrine, the undersigned used the word

4    "significant" as that quantum of evidence necessary to compel the state (respondent) at the

5    second step of that analysis to show that the challenge would have been made for "good" reason

6    and not the bad.  <u>See</u> also <u>Crittenden</u> at 958.   This was certainly  more than a *de minimis*

7    quantum, but not viewed in the context of what would be substantial or insubstantial in the final

8    analysis.  In the undersigned's thinking, the quantum involved in "significant" was more or less

9    establishing the prima facie case in the first place.  <u>See</u> <u>Gattis v. Snyder</u>, 278 F.3d 222, 233 (3rd

10    Cir. 2002) referring to test used by lower court.  Indeed, the evidence favoring petitioner at the

11    pretext stage was essentially the same evidence used to establish the prima facie case.  However,

12    unlike the <u>Batson</u> first step in which the strength of the inferences are not weighed, the key part

13    of the <u>Batson</u> third step is weighing the various inferences that can be drawn.  The evidence

14    favoring respondent was fully developed for the first time at the evidentiary hearing, i.e., the

15    rating system.  The district judge adopted the undersigned's "significant" finding—but indeed

16    found that discriminatory bias was *not* the motivating factor.  Order at 33 ("Where such a valid

17    and well supported race-neutral reason exists for Casey's challenge, the court cannot find that the

18    "real" or "motivating" reason for Casey's removal was her race.")

19           In any event, it is not the undersigned's task here to speculate how the previously

20    assigned district judge might view the "substantiality" of the prosecutor's bias motivation at this

21    time.  The undersigned has been given the assignment to arrive at his own conclusion, and this

22    conclusion will receive *de novo* review from the newly assigned judge.

23           The undersigned, the trier of fact at the evidentiary hearing, has conscientiously

24    reviewed the evidence and his thought pattern in reassessing the evidence in light of the

25    analytical paradigm directed by the Ninth Circuit.  In sum, although the finding that the

26    prosecutor harbored bias was "significant," it was not "substantial" in terms of the motivating

1 | factor at the time of the exercise of the peremptory challenge.

2 | *Conclusion*

3 |      Accordingly, the undersigned recommends that the third factor of the <u>Batson</u>

4 | analysis be found in favor of respondent and adverse to petitioner.  Claims 1 and 2 of the

5 | operative petition should be finally denied.  This conclusion, if adopted, finishes the district court

6 | work in this case.

7 |      These findings and recommendations are submitted to the United States District

8 | Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-

9 | one (21)  days after being served with these findings and recommendations, any party may file

10 | written objections with the court and serve a copy on all parties.  Such a document should be

11 | captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the

12 | objections shall be served and filed within fourteen (14) days after service of the objections.  The

13 | parties are advised that failure to file objections within the specified time may waive the right to

14 | appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

15 | Dated: June 29, 2011

16 |

17 |       /s/ Gregory G. Hollows
      UNITED STATES MAGISTRATE JUDGE

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |